UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NELSON OMAR RIVERA CASTILLO,

Petitioner,

v.

PHILIP RHONEY, *in his official capacity as Acting Field Office Director of the Buffalo Field Office of U.S. Immigration and Customs Enforcement*; JAMES BAUSCH, *in his official capacity as Acting Deputy Field Office Director, Buffalo Federal Detention Facility*,

Respondents.[1]

---

25-CV-1065 (JLS)

## DECISION AND ORDER

This case presents the question whether an alien who came to the United States illegally, remains in the country illegally, and is thereby "seeking admission" under 8 U.S.C. § 1225, has a protected liberty interest to remain free from detention while contesting his removal—all while he retains the keys to his liberty if he were to agree to that removal.

In particular, Petitioner challenges his detention pending removal proceedings on two grounds. First, he argues that his detention is not pursuant to Section 1225, which governs those "seeking admission," and allows detention

---

[1] Philip Rhoney and James Bausch have assumed their respective roles in the caption and are substituted automatically in place of their predecessors pursuant to Federal Rule of Civil Procedure 25(d).

without a bond hearing.  This Court decided that statutory issue in *Candido*, and that result applies here too: Section 1225 applies and provides for no bond hearing.

Next, he argues that his Section 1225 detention has become prolonged—at two years—such that the Fifth Amendment's due process clause now requires a bond hearing.  But a petitioner like this one, who is "seeking admission" under Section 1225, does not have a due process right to a bond hearing for several independent reasons, discussed below.  The Petition is, therefore, dismissed.

## BACKGROUND

Petitioner Nelson Omar Rivera Castillo is a citizen and national of Honduras.  *See* Dkt. 4-2 at 1-2.[2]  On April 5, 2023, he was convicted of Attempted Assault in the Second Degree in violation of N.Y. Penal Law §§ 110 and 120.05, a felony.  *See id.* at 2.  He was sentenced to one-to-three years of imprisonment and taken into New York State Department of Corrections and Community Supervision ("DOCCS") custody.  *See id.*

On or around May 23, 2023, U.S. Immigration and Customs Enforcement ("ICE") officials encountered Petitioner while he was detained at Ulster Correctional Facility serving his criminal sentence.  *See id.* at 2.  ICE determined that Petitioner entered the United States at an unknown date and time, without being admitted or paroled by a U.S. Immigration Officer.  *See id.*  There is no evidence that Petitioner has any lawful status in the United States.  In fact, he

---

[2] Page numbers refer to the CM/ECF generated numbering in the header of each page.

provided a sworn statement to an Immigration Officer stating that he entered the United States illegally. *See id.* As a result of the encounter with Petitioner, the Department of Homeland Security ("DHS") issued a Notice to Appear charging Petitioner as removable and issued a warrant for his arrest. *See id.* at 1-3. DHS took custody of Petitioner from DOCCS on March 6, 2024. *See* Dkt. 15.

On July 16, 2024, an Immigration Judge issued a decision denying a request by Petitioner for protection under the regulations implementing the Convention against Torture. *See* Dkt. 1 at 14. Petitioner appealed to the Board of Immigration Appeals ("BIA"). *See id.* at 14-16. On January 10, 2025, the BIA remanded Petitioner's case to the Executive Office for Immigration Review ("EOIR") for further development of the factual record and additional analysis. *See id.* On June 4, 2025, the Immigration Judge again denied Petitioner's applications for relief and ordered Petitioner removed. *See* Dkt. 4-3 at 1-2. Petitioner then appealed that decision to BIA on July 7, 2025, and his appeal remains pending. *See* Dkt. 4-3 at 1-2. Petitioner has been detained in DHS custody for two years during this process.

On October 20, 2025, Petitioner filed a petition with this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Dkt. 1. Petitioner alleges that, "DHS has not yet conducted a bond hearing to determine whether [his] continued detention is justified." *Id.* ¶ 8. He also argues that his "immigration detention is unreasonably prolonged because [he has] been detained for more than six months without a bond hearing . . . ." *Id.* ¶ 9. Petitioner asserts one cause of action alleging that his "ongoing detention" violates the Fifth Amendment to the United States

3

Constitution. *See id.* at 11.  He asks this Court to direct Respondents to release him from "further unlawful detention" and enjoin Respondents from "unlawfully detaining [him] any further" or, in the alternative, order a bond hearing.  *Id.* at 12.

Respondents moved to dismiss the Petition, arguing that "there is no indication that [Petitioner] has attempted to exhaust administrative remedies" and that, because Petitioner "is currently detained under 8 U.S.C. § 1225(b)(2)(A)" he is "ineligible for release under 8 U.S.C. § 1226(a)."  Dkt. 4-4 at 2.  Petitioner replied. Dkt. 6.  The parties then filed supplemental briefing regarding Petitioner's prolonged-detention argument.  Dkt. 16, 17.

<u>DISCUSSION</u>

## I.    JURISDICTION

Habeas corpus review is available to persons "in custody in violation of the Constitution or laws or treaties of the United States."  *See* 28 U.S.C. § 2241(c)(3). Jurisdiction over substantive challenges to final deportation, exclusion, and removal orders resides with the circuit courts; district courts lack jurisdiction over the merits of such orders.  *See Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) (holding that the REAL ID Act "eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . , which circuit courts alone can consider").  But district courts review claims that pre-removal detention is unconstitutional.  *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003).

4

In this case, Petitioner claims that his detention is unconstitutional based on its duration. Specifically, he claims that his now two-year detention without an individualized bond hearing, in which the Government bears the burden of proof, violates his procedural due process rights under the Fifth Amendment. *See, e.g.,* Dkt. 1 at 12.

Respondents argue that 8 U.S.C. §§ 1252(b)(9) and (g) strip this Court of jurisdiction. *See* Dkt. 4-4 at 3-8. But they concede that "this Court has rejected this argument in the past"—and raise it here only "to preserve any rights on appeal." *See id.* at 3 n.2. Indeed, in *Candido*, this Court concluded that, "because [the petitioner] does not challenge the Attorney General's decision or action 'to commence proceedings, adjudicate cases, or execute removal orders,' Section 1252(g) does not strip this Court of jurisdiction to address his petition." No. 25-CV-867 (JLS), 2025 WL 3484932, at *1 (W.D.N.Y. Dec. 4, 2025) (citing 8 U.S.C. § 1252(g); *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020)).

Further, the "very text of § 1252(b) sets out requirements only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *Ozturk v. Hyde*, 136 F.4th 382, 399 (2d Cir. 2025) (quoting 8 U.S.C. § 1252(b)). And "[n]o such order of removal is at issue here." *Id.* In "any event, the Supreme Court has rejected the proposed approach, holding that '§ 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined.'" *Id.* (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct.

1891, 1907 (2020)).  This Court, therefore, confirms that it has jurisdiction over Petitioner's claim.[3]

## II.    STATUTORY BACKGROUND

In 1952, Congress enacted the Immigration and Nationality Act ("INA"), which "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (internal citation and quotation marks omitted).  The INA has been amended several times—including in 1996 when Congress, concerned largely with the "number of aliens in removal proceedings who did not appear for their hearings," passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").  *Velasco Lopez*, 978 F.3d at 848 (citing Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996)).  Through the INA, as amended, "Congress has established a substantial, comprehensive, and intricate remedial scheme in the context of immigration." *Arar v. Ashcroft*, 585 F.3d 559, 572 (2d Cir. 2009).

The statute "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)." *Jennings v. Rodriguez*,

---

[3] Respondents also argue that the "Court should deny the petition as there is no indication that [Petitioner] has attempted to exhaust administrative remedies." *See* Dkt. 4-4 at 2.  Exhaustion, however, is not required here because such efforts would be futile.

583 U.S. 281, 289 (2018).[4]  It also "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)."  *Id.*

The "statutory scheme governing the detention of aliens in removal proceedings is not static; rather, the Attorney General's authority over an alien's detention shifts as the alien moves through different phases of administrative and judicial review."  *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 945 (9th Cir. 2008).  Accordingly, when "an alien has a final removal order that is not subject to a judicial stay, detention authority shifts to 8 U.S.C. § 1231(a)."  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1197 (9th Cir. 2022) (citing *Jennings*, 583 U.S. at 298).[5]

## III.   SECTION 1225 IS THE STATUTORY BASIS FOR PETITIONER'S DETENTION

At the outset, Petitioner argues that his detention is governed by Section 1226(c).  *See* Dkt. 16 at 4-5.  According to Petitioner, the "warrant pursuant to which DHS arrested Petitioner only authorizes detention pursuant to INA § 236

---

[4] Section 1225 will be discussed in more detail below.

[5] The "post-removal-period detention statute applies to certain categories of aliens who have been ordered removed, namely, inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons, as well as any alien 'who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal.'" *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (quoting 8 U.S.C. § 1231(a)(6) (1994 ed. Supp. V)).  It "says that an alien who falls into one of these categories 'may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision.'" *Id.* at 689.

(*i.e.* 8 U.S.C. § 1226)." *Id.* at 4.  He explains that Section 1226(a) "gives the Attorney General the authority to issue warrants to arrest and detain noncitizens," while Section 1226(c) "directs the Attorney General to 'take into custody' non-citizens that have committed certain crimes while present in the United States pending removal proceedings." *Id.*  He claims, therefore, that "he is being detained pursuant to [Section] 1226(c)(1)(C)." *Id.* at 5.

Respondents contend that Petitioner's detention is governed by Section 1225(b).  *See* Dkt. 4-4 at 8.  They explain that aliens—like Petitioner—who "have not been admitted or inspected and paroled are defined as applicants for admission under [Section] 1225(a)(1)." *See id.* (citing *Candido*, No. 25-CV-867 (JLS), 2025 WL 3484932, at *1).  Petitioner, "as an applicant for admission (specifically, an alien present without admission)," was "placed directly into removal proceedings under 8 U.S.C. § 1229a." *Id.*  Accordingly, in Respondents' view, he is "subject to detention pursuant to 8 U.S.C. § 1225(b)(2)(A) and ineligible for bond." *Id.*

Petitioner is indeed detained under Section 1225, which provides for detention, without a bond hearing, during removal proceedings.  As this Court determined in December 2025 in *Candido*, "Section 1225(b)(2)(A) provides for detention pending removal proceedings: '[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under [S]ection 1229a of this title.'" *Candido*, No. 25-CV-867 (JLS), 2025 WL 3484932, at *1 (quoting 8 U.S.C. §

8

1225(b)(2)(A)).  "Applicant for admission" includes those "who [have] not been admitted *or* who arrive[] in the United States (whether or not at a designated port of arrival) . . . ."  8 U.S.C. § 1225(a)(1) (citation modified).  Again, as this Court explained in *Candido*, a fair reading of the statute, in context, requires detention of aliens, such as Petitioner, who have not been admitted.

In particular, as this Court reasoned in *Candido*, "seeking admission" is not a limitation or a separate classification.  Rather, as discussed below, the terms are synonyms—a conclusion based on a fair reading of the statute and the ordinary meaning of its terms.

First, the alteration in terms is repeated in similar fashion, such that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission *or* readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3) (citation modified).

Moreover, the "term 'application for admission' has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa."  8 U.S.C. § 1101(a)(4) (definitions that apply to Chapter 12, which includes Section 1225).  Indeed, the "terms 'admission' and 'admitted' mean, with respect to an alien,[6] the lawful entry of the alien into the United States after inspection and authorization by an immigration

---

[6] "Alien" means "any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(4).

officer." 8 U.S.C. § 1101(a)(13)(A) (definitions that apply to Chapter 12, which includes Section 1225).[7]

The statutory scheme thus reveals that the terms "applicant for admission" and "seeking admission" are synonymous.[8] As such, one who enters the country unlawfully is an "applicant for admission" subject to detention without a bond hearing—and is not someone other than that under the statute who might be entitled to Section 1226 treatment. In other words, detention under Section 1225(b)(2)(A) is not reserved for aliens "seeking admission," as if that were a different category from "applicants for admission."

Second, "applicant" and "seeker" are, indeed, accepted synonyms. *See* ROGET'S II: THE NEW THESAURUS 45 (3rd ed. 1995); *Synonyms of applicant*, MERRIAM-WEBSTER THESAURUS, https://www.merriam-webster.com/thesaurus/applicant (last visited March 19, 2026).

---

[7] Similarly, an "alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(C)(vi).

[8] In a different context, the Fourth Circuit recognized the interchangeable nature of these terms. *See Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 194 n.2 (4th Cir. 2021) ("As for the limitation of these waivers to those 'seeking admission,' the INA states that 'an alien present in the United States who has not been admitted shall be deemed for purposes of this chapter an applicant for admission' . . . . Because Jimenez-Rodriguez was never lawfully admitted, he qualifies as someone 'seeking admission' . . . .") (citation modified)).

Moreover, "seek" is defined as "to ask for" or "request." *Definition of seek*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/seek (last visited Dec. 3, 2025). And "applicant" means "[s]omeone who requests something." *Applicant*, BLACK'S LAW DICTIONARY (11th ed. 2019).

And third, there is no "material variation" in meaning between these two terms; as such, there is no reason to apply interpretive canons. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.").[9] Rather, "[w]ords are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense." *Id.* at 69 (Canon 6: Ordinary-Meaning Canon). And the "words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Id.* at 56 (Canon 2: Supremacy-of-Text Principle).

In sum, the statutory structure, the fact that the terms are synonyms, the immaterial alteration, and ordinary meaning all point to the conclusion that Section 1225(b)(2)(A) speaks of only one type of alien—one *who has not been admitted* or who "arrives"—and does not create a subset only as to which the

---

[9] "[M]ore than most other canons," this canon of the presumption of consistent usage "assumes a perfection of drafting that, as an empirical matter, is not often achieved." *Id.* "[D]rafters . . . often (out of a misplaced pursuit of stylistic elegance) use different words to denote the same concept." *Id.*

11

statute actually applies. See this Court's prior decision in *Candido v. Bondi*, No. 25-CV-867 (JLS), 2025 WL 3484932, at *3 (W.D.N.Y. Dec. 4, 2025).

Here, Petitioner is an "applicant for admission" within the meaning of Section 1225(a)(1). He entered the United States at an unknown location on an unknown date. *See* Dkt. 4-2 at 2-3. He has never been admitted. *See id.* And there is no indication that he has any lawful status in the United States or a claim to U.S. citizenship. *See id.*

Section 1225(b)(2)(A) does not require a bond hearing and, instead, permits Respondents to proceed without one here.[10] In fact, because Petitioner has not been "admitted" into the United States, his argument that he is not also "seeking admission" creates his own extra-statutory status. Under such status, after *some undetermined period of time* of merely residing unlawfully in the United States, he no longer is "seeking admission" and, thereby, converts himself to bond-eligible under Section 1226,[11] by nothing more than remaining in the country unlawfully.

---

[10] In contrast, the Government reserves Section 1226 to aliens who have been admitted.

[11] Under Section 1226(a)(2)(A), upon "a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States" but the Attorney General "may release the alien" on "bond of at least $1,500 . . . ." Section "1226(c) directs that the government 'shall detain' noncitizens who are charged with removability based on a prior conviction on specified criminal grounds or on allegations of involvement with terrorism. It makes no explicit provision for an initial or other bond hearing during the period of detention and places no limit on the duration of detention under its authority." *Black v. Decker*, 103 F.4th 133, 137 (2d Cir. 2024). But, under *Black*, such a bond hearing is possible.

12

Relevant here, too, is the Supreme Court's observation that, with "a few exceptions . . . , the Attorney General may 'for urgent humanitarian reasons or significant public benefit' temporarily parole aliens detained under [Sections] 1225(b)(1) and (b)(2)," and that the "express exception to detention implies that there are no *other* circumstances under which aliens detained under [Section] 1225(b) may be released." *Jennings*, 583 U.S. at 300 (2018) (quoting 8 U.S.C. § 1182(d)(5)(A), and citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012)) (citation modified).[12]

For all of these reasons, the Court remains satisfied that the statute does not require a bond hearing here. This result is also consistent with the primacy of the political branches in this area of law.[13] A contrary result ignores these substantive

---

[12] The particular canon cited from Scalia and Garner's text was the "Negative–Implication Canon," under which the "expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)." *Id.*

[13] The Supreme Court's holding in *Demore* aligns with its prior recognition that "the responsibility for regulating the relationship between the United States and [its] alien visitors [is] committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "[o]ver no conceivable subject is the legislative power of Congress more complete." *Reno v. Flores*, 507 U.S. 292, 305 (1993) (citation modified). Because decisions regarding immigration "may implicate [the United States'] relations with foreign powers, and [because] a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently . . . more appropriate [for] either the Legislature or the Executive than [for] the Judiciary." *Diaz*, 426 U.S. at 81. *See also United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government.").

That Court, therefore, has "underscore[d] the limited scope of judicial inquiry" into issues related to immigration legislation. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).

13

principles, and also mandates perfection in legislative drafting, which courts also must not demand. *See, e.g., Torres v. Lynch*, 578 U.S. 452, 472 (2016) (acknowledging "little doubt that Congress could have drafted [a different provision of the INA] with more precision than it did," that "the same could be said of many (even most) statutes," and that the Court has "long been mindful of that fact when interpreting laws").[14]

---

The power over matters related to "aliens is of a political character and therefore subject only to narrow judicial review." *Id.* (citation modified). In particular:

> Any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Diaz*, 426 U.S. at 81 n.17 (citation modified). Courts must employ "a narrow standard of review of decisions made by the Congress or the President" regarding immigration. *See id.* at 81–82.

[14] Instead of "expecting (let alone demanding) perfection in drafting," the Supreme Court has "routinely construed statutes to have a particular meaning even as [it] acknowledged that Congress could have expressed itself more clearly." *Id.* The question "is not: Could Congress have indicated (or even did Congress elsewhere indicate) in more crystalline fashion" that the statutory provision has a particular meaning? *Id.* at 472–73. Rather, the question is "simply: Is that the right and fair reading of the statute before us?" *Id.*

14

As discussed in *Candido,* this Court has considered decisions from other courts on this issue and is persuaded by some[15] but not persuaded by others.[16] Again, the fact that more district courts nevertheless have decided this statutory issue differently from this Court is neither binding nor persuasive.

For all of these reasons, Petitioner is an "applicant for admission" subject to mandatory detention under Section 1225(a)(1) and (b)(2)(A), and is ineligible for bond under the statute.

## IV.    PETITIONER'S DETENTION COMPORTS WITH THE FIFTH AMENDMENT

Petitioner also challenges the constitutionality of his detention under the Fifth Amendment's Due Process Clause, arguing that it has become prolonged. Petitioner's argument fails.

---

[15] *See Buenrostro-Mendez v. Bondi,* 166 F.4th 494 (5th Cir. 2026) (after "reviewing carefully the relevant provisions and structure of the Immigration and Naturalization Act, the statutory history, and Congressional intent, [the court] conclude[d] that the government's position is correct"); *see, e.g., Altamirano Ramos v. Lyons,* No. 2:25-cv-9785-SVW-AJR, 2025 WL 3199872 (C.D. Cal. Nov. 12, 2025); *Vargas Lopez v. Trump,* No. 8:25CV526, 2025 WL 2780351 (D. Neb. Sept. 30, 2025); *Chavez v. Noem,* No. 3:25-cv-2525-CAB-SBC, 2025 WL 2730228 (S.D. Cal. Sept. 24, 2025); *Sandoval v. Acuna,* No. 6:25-cv-1467, 2025 WL 3048926 (W.D. La. Oct. 31, 2025); *Pena v. Hyde,* Civil Action No. 25-11983-NMG, 2025 WL 2108913 (D. Mass. July 28, 2025).

[16] *See, e.g., Alvarez Ortiz v. Freden,* No. 25-CV-960-LJV, 2025 WL 3085032 (W.D.N.Y. Nov. 4, 2025); *J.U. v. Maldonado,* No. 25-CV-4836 (OEM), 2025 WL 2772765 (E.D.N.Y. Sept. 29, 2025); *Savane v. Francis,* No. 1:25-cv-6666-GHW, 2025 WL 2774452 (S.D.N.Y. Sept. 28, 2025); *Lopez Benitez v. Francis,* No. 25 Civ. 5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025).

The Fifth Amendment provides that no person shall be (1) "deprived of," (2) "liberty," (3) "without due process of law." U.S. CONST. amend V.

It is "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 538 U.S. at 523 (quoting *Reno,* 507 U.S. at 306) (internal quotation marks omitted). But Petitioner is not complaining about the conduct of his deportation *proceedings*. Moreover, the Supreme Court has also recognized that, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Id.* Indeed, "deportation proceedings 'would be in vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id.* (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). *See also Zadvydas*, 533 U.S. at 711 (Kennedy, J., dissenting) ("Congress' power to detain aliens in connection with removal or exclusion . . . is part of the Legislature's considerable authority over immigration matters.").

Equally clear are the "constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To determine the safeguards necessary to ensure that a petitioner receives "the opportunity to be heard at a meaningful time and in a meaningful manner," the Court considers: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of [that] interest through the procedures used, and the probable value, if any, of additional procedural

16

safeguards;" and (3) the "[g]overnment's interest, including the function involved and the . . . burdens that [any other] procedural requirement would impose." *Id.* at 333, 335 (internal quotation marks and citation omitted). That analysis animates the Court's thinking throughout, and is done explicitly below.

As noted above, Petitioner's detention is mandatory under 8 U.S.C. § 1225(b)(2)(A). His resulting due process claim now fails for several reasons. First, he lacks a protected liberty interest in being released into the United States—all while he has the power to end his detention by withdrawing his defense to removal proceedings and consenting to removal. Second, whatever process that is due is provided by statute—which requires neither release nor a bond hearing. Lastly, the *Mathews* factors would, in any event, provide no relief here, when Congress has prescribed his mandatory detention. For each of these independent reasons, the due process argument fails and the Petition must be dismissed.

## A.   Petitioner Lacks a Constitutionally Protected Interest

While "the amount and quality of process that [the Supreme Court's] precedents have recognized as 'due' under the Clause has changed considerably since the founding, it remains the case that *no* process is due if one is not deprived of 'life, liberty, or property.'" *Kerry v. Din*, 576 U.S. 86, 90 (2015) (internal citations omitted) (emphasis added). Accordingly, to maintain a due process claim, a party must first "plausibly allege a protected liberty interest." *Baez v. Pinker*, 673 F. App'x 50, 52 (2d Cir. 2016) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (substantive due process); *Board of Regents of State Colls. v. Roth*, 408 U.S.

17

564, 571–72 (1972) (procedural due process)).[17]  Indeed, it is "axiomatic that a cognizable liberty . . . interest must exist in the first instance for a procedural due process claim to lie." *Mudric v. Att'y Gen. of U.S.*, 469 F.3d 94, 98 (3d Cir. 2006) (citing *Roth*, 408 U.S. at 569).

This Court's due process analysis, therefore, "must begin with a careful description of the asserted right." *Reno*, 507 U.S. at 302.  And to articulate Petitioner's proffered liberty interest is to refute its existence.

In particular, Petitioner, an unadmitted alien, challenges his "physical confinement" in DHS custody. *See* Dkt. 1 at 8.  In *Zadvydas*, the Supreme Court considered due process claims pertaining to aliens "who were admitted to the United States but subsequently ordered removed." 533 U.S. at 682.  In that scenario, like the one presented here, the alien can be said to "claim[] a constitutional right of supervised release *into the United States*." *Id.* at 702 (Scalia and Thomas, JJ., dissenting) (emphasis added).  And that claim "can be repackaged as freedom from 'physical restraint' or freedom from 'indefinite detention,' but it is[,] at bottom[,] a claimed right of release into this country by an individual who *concededly* has no legal right to be here." *Id.* (internal citation omitted) (emphasis in original).

More precisely, Petitioner's proffered "private interest" is "not liberty in the abstract, but liberty *in the United States* by someone [not] entitled to remain in this

---

[17] Petitioner "could not conceivably claim" deprivation of "life or property" on these facts. *See Din*, 576 U.S. at 92.

country but eligible to live at liberty in his native land." *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) (emphasis in original).  In other words, Petitioner claims a constitutionally protected right to (1) release from custody; (2) into the United States; (3) all while he holds the keys to his freedom from physical restraint by leaving the country.[18]

The Constitution protects no such liberty interest.  As discussed below, the Supreme Court's precedents, including *Zadvydas*, *Demore*, and *Jennings*, establish that: (1) a removable alien does not have a liberty interest in being released into the United States while removal proceedings are pending; and (2) detention under Section 1225(b) has a definite termination point and, therefore, does not implicate the due process concerns associated with indefinite detention.  Accordingly, Petitioner has not been deprived of a protected liberty interest.  His due process claim, therefore, must fail.

    1.    <u>Petitioner Does Not Have Protected Liberty Interest in Release into the United States</u>

There is no basis in the Supreme Court's precedents—or elsewhere in this nation's history and traditions—to expand the meaning of "liberty" to encompass the interest Petitioner suggests.

Indeed, at the outset, "liberty," as "originally understood . . . likely referred only to freedom from physical restraint." *Gutierrez v. Saenz*, 606 U.S. 305, 325

---

[18] That is fundamentally different from a detention over which Petitioner has no control.

19

(2025) (Thomas, J. dissenting). In the eighteenth century, William Blackstone defined "the right of personal liberty" as "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law." WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 130 (1765). Following Blackstone, "[s]tate decisions interpreting [state due process] provisions between the founding and the ratification of the Fourteenth Amendment almost uniformly construed the word 'liberty' to refer only to freedom from physical restraint." *Obergefell v. Hodges*, 576 U.S. 644, 724-25 (2015) (Thomas, J., dissenting) (citing C. Warren, The New "Liberty" Under the Fourteenth Amendment, 39 Harv. L. Rev. 431, 441–445 (1926)).

But this case is not simply a case about criminal pretrial detention or other straightforward infringements on freedom from physical restraint. Instead, Petitioner himself, an applicant for admission, controls whether or not he is detained. He can free himself by agreeing to depart. The claimed interest is unique and, as such, an analogous measuring tool that is based on history and tradition is needed, and may be found in the context of the Supreme Court's adjacent "fundamental rights" caselaw.

For example, *Glucksberg* supports this thought process. *See e.g., Dep't of State v. Muñoz*, 602 U.S. 899 (2024).[19] *Glucksberg* requires—in addition to a

---

[19] *Muñoz* considered a right "in a category of one: a substantive due process right that gets only procedural due process protection." 602 U.S. at 911. In particular, the Court applied *Glucksberg* in a situation where a citizen claimed that her "right

"careful description of the asserted fundamental liberty interest"—that the purported right be "objectively, deeply rooted in this Nation's history and tradition." 521 U.S. at 720–721 (internal citation and quotation marks omitted). That test helps assess the claimed liberty interest here.

Petitioner identifies no historical law—or any other aspect of this country's history or traditions—that supports an unadmitted alien's claimed constitutional liberty interest in release into the United States (or a bond hearing) while he holds the keys to his freedom while trying to avoid removal.

Indeed, early immigration laws concerning detention lend no support to Petitioner's position. From the outset, the first federal immigration laws have generally authorized detention of aliens who are subject to removal. *See* HILLEL R. SMITH, CONG. RSCH. SERV. R45915, IMMIGRATION DETENTION: A LEGAL OVERVIEW 5 (2019). The first law on alien detention was the Alien Enemies Act in 1798, which subjected certain aliens from "hostile" nations during times of war to being detained and removed. *See id.* (citing Alien Enemies Act, 5 Cong. ch. 66, §§ 1, 2, 1 Stat. 577 (1798)). *See also Land of the Free? Immigration Detention in the United States*, 64 Fed. Law. 46, 48 (2017) (noting that the Alien Enemies Act "became the first (and oldest) statute authorizing alien detention").

---

to live with her noncitizen spouse in the United States is implicit in the 'liberty' protected by the Fifth Amendment. . .[and] the denial of her husband's visa deprived her of this interest, thereby triggering her right to due process." *Id.* at 903. The Court rejected her claim, noting that "procedural due process is an odd vehicle for [her] argument." *Id.* at 919.

Starting in 1875, "Congress enacted a series of laws restricting the entry of certain classes of aliens (*e.g.*, those with criminal convictions), and requiring the detention of aliens who were excludable under those laws until they could be removed." SMITH, *supra* at 5 (citing Page Act of 1875, 43 Cong. ch. 141, § 5, 18 Stat. 477 (1875); Immigration Act of 1882, 47 Cong. ch. 376, § 2, 22 Stat. 214 (1882); Immigration Act of 1891, 51 Cong. ch. 551, § 8, 26 Stat. 1084, 1085 (1891); An Act to Facilitate the Enforcement of the Immigration and Contract-Labor Laws of the United States, 52 Cong. ch. 206, § 5, 27 Stat. 569, 570 (1893)).

In construing the Government's detention authority, the Supreme Court in 1896 declared that, "[w]e think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid." *Wong Wing*, 163 U.S. at 235. And as noted above, the Court explained that, "[p]roceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation." *Id.*

Over the next few decades (leading up to enactment of the INA), Congress "continued to enact laws generally mandating the detention and exclusion of proscribed categories of aliens seeking entry into the United States, as well as aliens physically present in the United States who became subject to removal." SMITH, *supra* at 6 (citing Immigration Act of 1903, 57 Cong. Ch. 1012, § 21, 32 Stat. 1213, 1218 (1903); Immigration Act of 1907, 59 Cong. Ch. 1134, §§ 20, 21, 24, 34

22

Stat. 898, 904-06 (1907); Immigration Act of 1917, 64 Cong. Ch. 29, §§ 16, 19, 39 Stat. 874, 886, 889 (1917)).

No aspect of this historical landscape supports Petitioner's purported liberty interest. Petitioner has not been deprived of any protected liberty interest. To the extent he seeks "freedom from physical restraint," he may "withdraw his defense of the removal proceeding and return to his native land, thus ending his detention immediately." *Parra*, 172 F.3d at 958. In other words, he holds "the keys in his pocket." *Id.* But it stretches the concept of liberty "too far" to suggest that Petitioner is deprived of liberty when he is not released *into the United States*—all while he holds the keys to his freedom, yet fights his removal.

### 2. Petitioner Does Not Have a Protected Liberty Interest in Freedom from "Prolonged" Detention

Petitioner also cannot establish a protected liberty interest based on the duration of his detention in DHS custody. There is no suggestion that his detention is divorced from ongoing, good-faith removal proceedings. And as discussed below, Petitioner's detention has a definite termination point—the conclusion of his removal proceedings. In the meantime, he may obtain release by consenting to removal to his native country rather than continuing to contest removal. These circumstances differ materially from the sort of potentially indefinite detention that the Supreme Court instructs may, at some point, raise due process concerns.

For example, in *Zadvydas*, the Supreme Court concluded that, "indefinite detention of aliens" who "were admitted to the United States but subsequently

23

ordered removed" would "would raise serious constitutional concerns." 533 U.S. at 682.[20]

Two years later, in *Demore*, the Court distinguished detention of criminal aliens under Section 1226(c) from the indefinite detention discussed in *Zadvydas*. In particular, the Court concluded that Section 1226(c) detention is permissible because it is neither "indefinite" nor "potentially permanent." *See* 538 U.S. at 528.[21] *Zadvydas* itself recognized the same distinction. There, the Court distinguished Section 1231 from Section 1226(c) based on the indefiniteness of the detention: "importantly," the Court said, "post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point." *Zadvydas*, 533 U.S. at 697. *See also Demore*, 538 U.S. at 529 ("*Zadvydas* distinguished the statutory provision it was there considering from § 1226 on these very grounds.").

*Zadvydas* also recognized that aliens, like Petitioner here, "*who have not yet gained initial admission to this country*[,] would present a very different question" than "aliens who were admitted to the United States but subsequently ordered removed." 533 U.S. at 682 (emphasis added). The *Jennings* Court then concluded

---

[20] *Zadvydas* addressed detention under Section 1231, which governs detention of aliens subject to final orders of removal.

[21] The Court later emphasized in *Jennings* that *Demore* "made clear" that the "definite termination point—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c)." 583 U.S. at 304 (internal quotation marks omitted).

that Sections "1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded." 583 U.S. at 297. And once "those proceedings end, detention under § 1225(b) must end as well." *Id.* Until "that point, however, nothing in the statutory text imposes any limit on the length of detention." *Id.*[22]

*Zadvydas* also instructs that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. In other words, only "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. Due process considerations arise once removal is no longer foreseeable because, "where detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed." *Id.* at 690 (internal quotation marks and alterations omitted). That "purpose," the Court said, was "ensuring the appearance of aliens at future immigration proceedings." *Id.* (internal citation omitted).

But the key principle of *Zadvydas* requiring additional justification for detention that no longer serves its purpose does not apply in the case of applicants

---

[22] It is true that, in *Demore*, the Court described detention pending deportation as "brief," "limited," and "short[ ]." *Demore*, 538 U.S. at 513, 523, 526. But nothing in *Demore* mandates any specific form of brevity; nor does *Demore* define that term. Instead, the *Demore* Court recognized that detention pending a determination of removability has a "definite termination point." *Id.* at 529. In short, it is the indefiniteness of the detention—not its mere length—that implicates the Due Process Clause. The "*why*, in other words, is more important than *how long*." *Banyee v. Garland*, 115 F.4th 928, 932 (8th Cir. 2024) (emphasis in original).

for admission whose removal proceedings are ongoing. Under the circumstances of *Zadvydas*—where "removal proceedings had ended, a final order of removal had issued, the statutory removal period had expired, and there still was no likelihood of effectuating the removal—the detention no longer appeared to serve the purpose of facilitating ongoing removal proceedings." *Black v. Almodovar*, 156 F.4th 171, 183 (2d Cir. 2025) (Menashi, J., dissenting from the denial of rehearing en banc) (citing *Demore*, 538 U.S. at 527).

Those circumstances bear no resemblance to detention of applicants for admission during removal proceedings. Detention under Section 1225(b)(2)(A) is authorized—and required—if the "examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." And as the *Jennings* Court noted, detention under Section 1225(b) must end when certain proceedings have concluded.

At bottom, the duration of Petitioner's detention has resulted from his continued attempts to avoid removal and remain in this country. He is, in essence, his own gatekeeper. As noted above, Petitioner chose to appeal an Immigration Judge's denial of his request for protection under the regulations implementing the Convention against Torture. *See* Dkt. 1 at 14-16. Following BIA's remand of the case, and the Immigration Judge's subsequent removal order, Petitioner again filed an appeal with BIA, which remains pending. *See* Dkt. 4-3 at 1-2.

Petitioner, of course, may avail himself of all "process" available to him in his removal proceedings—including requesting extensions of time, adding claims or

26

bases for relief from removal, and appealing all adverse decisions. But he cannot expect resulting delay in his removal proceedings to give birth to a due process claim. If a petitioner could delay enough and thereby earn release, he could defeat the process. *See Demore*, 538 U.S. at 531 n.14 (concluding "there is no constitutional prohibition against requiring parties" to "mak[e] . . . difficult judgments," such as whether to risk a lengthier detention by exercising their right to appeal); *id.* at 531 n.15 (considering the delay resulting from the alien's request for a continuance of his removal hearing so he could obtain relevant documents).

Indeed, the Second Circuit has held that, "[a]lthough this litigation strategy is perfectly permissible," an alien "may not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process." *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991).

The fact is that an alien detained under Section 1225(b) "'has the keys in his pocket' and can 'end his detention immediately' by 'withdrawing his defense and returning to his native land.'" *Banyee*, 115 F.4th at 933 (alterations omitted) (quoting *Parra*, 172 F.3d at 958). And as the Second Circuit noted in another context, "from the outset of his detention, [the petitioner] has possessed, in effect, the key that unlocks his prison cell." *Doherty*, 943 F.2d at 212.

Here, too, if Petitioner "had agreed to deportation in the first place, he would not have been detained" for the past two years. *See id.* He controls whether he is detained or not. Indeed, it is "a perverse interpretation of the Due Process Clause" under which Congress, by affording an unadmitted alien "*more* process to contest

27

his removal and to seek immigration relief, thereby invalidates its own authority to detain the alien until the process concludes." *See Black*, 156 F.4th at 186 (Menashi, J., dissenting from the denial of rehearing en banc) (emphasis in original).

In sum, the length of Petitioner's detention does not violate due process. There is no indication that Petitioner's pending removal proceedings are a sham, or that Respondents are otherwise unlikely to effectuate his removal—if ordered and upheld—in the reasonably foreseeable future. What "is important is that, notwithstanding [any] delay, deportation remains a possibility." *Banyee*, 115 F.4th at 933) (internal citation omitted). And because detention under Section 1225(b) "has a definite termination point" at "the conclusion of removal proceedings," removal remains possible throughout Section 1225(b) detention. *Jennings*, 583 U.S. at 304 (internal quotation marks omitted).

This conclusion adheres to the Supreme Court's instruction that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701.

The Court's holding in *Demore* aligns with its prior recognition that "the responsibility for regulating the relationship between the United States and [its] alien visitors [is] committed to the political branches of the Federal Government." *Diaz*, 426 U.S. at 81. Indeed, "[o]ver no conceivable subject is the legislative power of Congress more complete." *Flores*, 507 U.S. at 305 (internal quotation marks and citations omitted). Because decisions regarding immigration "may implicate [the

28

United States'] relations with foreign powers, and [because] a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently . . . more appropriate [for] either the Legislature or the Executive than [for] the Judiciary." *Diaz*, 426 U.S. at 81. *See also Valenzuela-Bernal*, 458 U.S. at 864 (citing *Diaz*, 426 U.S. at 81) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government.").

Indeed, imagine a scenario where the number of aliens surges, increasing the volume of removal proceedings and, thereby, slowing the pace at which those proceedings move. If duration alone warrants bond hearings, that scenario arrogates this very sovereignty issue to the judiciary—and to the aliens themselves by virtue of their chosen litigation strategy. The Constitution does not require that outcome.

As a result of these broad concerns, the Supreme Court has "underscore[d] the limited scope of judicial inquiry" into issues related to immigration legislation. *Fiallo*, 430 U.S. at 792. The power over matters related to "aliens is of a political character and therefore subject only to narrow judicial review." *Id.* (citation omitted). In particular:

> [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the

29

political branches of government as to be largely immune from judicial inquiry or interference.

*Diaz*, 426 U.S. at 81 n.17 (internal quotation marks and citations omitted).

Against this careful backdrop, courts must pay particular attention to the constitutional interests, governance concerns, and individual rights involved in these weighty questions. Indeed, courts must employ "a narrow standard of review of decisions made by the Congress or the President" regarding immigration and must exercise "the greatest caution" in evaluating constitutional claims that implicate those decisions. *See id.* at 81–82.

Under these circumstances, Petitioner does not have a Constitutionally protected liberty interest.

**B.    Any Process Due to Petitioner is Provided by Statute**

Even assuming the existence of a relevant, protected liberty interest, Petitioner has received all the process that he is due. As discussed above, Petitioner is an "applicant for admission" under Section 1225(a)(1) and is detained pursuant to Section 1225(b)(2)(A). Accordingly, for the reasons below, any process due to Petitioner is limited to the procedure authorized by Congress, which requires neither release nor a bond hearing.

Once an "alien *lawfully* enters and resides in this country[,] he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 n.5 (1953) (emphasis

added).[23] But the Supreme Court "has long held that an alien *seeking initial admission* to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (emphasis added). Indeed, the "Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *Kwong Hai Chew*, 344 U.S. at 598 n.5.[24]

---

[23] Indeed, "[m]ere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Id.* The Court is aware that the Supreme Court has recognized due process rights in aliens' removal proceedings, *see, e.g., Demore*, 538 U.S. at 523 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings") (quoting *Reno*, 507 U.S. at 305), and that certain rights apply to all "persons." But a very narrow claimed right is at issue in this case.

[24] The Court rejects any argument that Petitioner is not "seeking admission" because he was not apprehended the instant he attempted to enter the country. In *Dep't of Homeland Sec. v. Thuraissigiam*, the Supreme Court rejected an argument that an alien who "succeeded in making it 25 yards into U.S. territory before he was caught" should be "treated more favorably" than if he had been stopped at the border. 591 U.S. 103, 139 (2020). Like "an alien detained after arriving at a port of entry," Petitioner must be treated as if he "is 'on the threshold'" of initial entry. *Id.* at 140 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). In other words, although Petitioner had been "physically present in the United States" for a period of time prior to apprehension by DHS, he "is 'legally considered to be detained at the border and hence as never having effected entry into this country.'" *Sierra Immigr. & Naturalization Serv.*, 258 F.3d 1213, 1218 (10th Cir. 2001) (quoting *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir.), amended by 997 F.2d 1122 (5th Cir. 1993)). To conclude otherwise "would undermine the 'sovereign prerogative' of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location." *Thuraissigiam*, 591 U.S. at 140 (quoting *Landon*, 459 U.S. at 32). The duration of time evading removal does not change the result.

31

More than a century ago, the Supreme Court "wrote that[,] as to 'foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law,' 'the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.'" *Thuraissigiam*, 591 U.S. at 138 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)). Since then, the Court "has often reiterated this important rule." *Id.*

For example, in 1953, the Court emphasized that "an alien on the threshold of initial entry" stands on a "different footing" than "aliens who have once passed through our gates"—and explained that, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Mezei*, 345 U.S. at 212 (internal citation and quotation marks omitted). *See also U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"). Accordingly, when "a noncitizen attempts to unlawfully cross the border," his "constitutional right to due process does not extend beyond the rights provided by statute." *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 676 (S.D. Tex. 2021).

Any process due to Petitioner, therefore, is limited to "the procedure authorized by Congress." *Mezei*, 345 U.S. at 212. *See also Augustin v. Sava*, 735 F.2d 32, 36 (2d. Cir. 1984) ("Although aliens who petition for admission have no constitutional rights regarding their applications, they do have such statutory rights as Congress grants").

32

Section 1225(b)(2)(A), with limited exceptions irrelevant here, mandates detention of aliens in removal proceedings: "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title" (emphasis added). *See also* 8 C.F.R. § 235.3(b)(1)(ii) (same).[25] In fact, immigration judges are prohibited by regulation from holding bond hearings for arriving aliens. *See* 8 C.F.R. § 1003.19(h)(2)(i)(B) ("[A]n immigration judge may not redetermine conditions of custody imposed by the Service with respect to . . . [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act.").

Indeed, the Supreme Court has confirmed that, read "most naturally," Section 1225(b)(2) "mandate[s] detention of applicants for admission until certain proceedings have concluded." *Jennings*, 583 U.S. at 297. And once "those proceedings end, detention under § 1225(b) must end as well." *Id.* Until "that point, however, nothing in the statutory text imposes any limit on the length of detention." *Id.* And Section 1225(b)(2) does not say "anything whatsoever about bond hearings." *Id.* *See also Nieto v. Ceja*, No. 1:24-CV-02821-DDD-NRN, 2025 WL 4087626, at *7 (D. Colo. June 12, 2025) ("[P]rocedural due process does not

---

[25] In addition, 8 U.S.C. § 1182(d)(5) authorizes the Secretary of Homeland Security, "in his discretion," to parole noncitizens applying for admission to the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

afford inadmissible arriving aliens subject to prolonged detention a right to release or a bond hearing prior to the conclusion of removal proceedings. . . . The statutory procedures authorized by Congress here dictate that [the petitioner] be detained unless she is admitted or paroled . . . and the parole statute commits the decision of whether to parole an inadmissible arriving alien to the discretion of the Secretary of Homeland Security") (internal citations omitted)).

Accordingly, Petitioner has received all the process he is due.[26] And because the relevant statute requires neither release nor a bond hearing, Petitioner's procedural due process claim fails for this reason too.

## C.    Petitioner Also Fails Under *Mathews v. Eldridge*

Finally, to the extent a potential due process claim remains for further evaluation, this Court recognizes that, as a general proposition, deciding what process is due ordinarily requires interest balancing under the framework outlined in *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).[27]

---

[26] *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020), and *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), do not control here. Those cases address detention under Sections 1226(a) and (c). The Second Circuit has never held that aliens detained pursuant to Section 1225(b)—and are "seeking admission"—are entitled to bond hearings after any period of detention. Section 1226 can be limited, as the Government does, to admitted aliens. And those decisions do not articulate a historical liberty interest of the sort that Petitioner claims here. Finally, to the extent these cases are somehow read to require a *Mathews* analysis here, that follows.

[27] *See, e.g., Black*, 103 F.4th at 150; *Velasco Lopez*, 978 F.3d at 842. In this Court's view, however, *Zadvydas* and *Demore* have already done whatever balancing is necessary. *See, e.g., Zadvydas*, 533 U.S. at 682, 701 (linking a "'reasonable time' limitation" to "the likelihood of removal in the reasonably foreseeable future"); *Demore*, 538 U.S. at 528 (explaining that, "when the Government deals with

The *Mathews* factors favor Respondents. First, while Petitioner asserts an interest in freedom from imprisonment, the "private interest here is not liberty in the abstract, but liberty in the United States" by someone who has not been admitted to the country but remains eligible to live at liberty in his native land. *See Parra*, 172 F.3d at 958. And any interest Petitioner may have in freedom from imprisonment is outweighed by the fact that "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore*, 538 U.S. at 526. Moreover, because Petitioner's detention has a definite end point, any private interest will only be affected for a limited time.

Second, the risk of erroneous deprivation of liberty here is slight. There is no evidence to suggest that the ordinary process is deficient in mitigating the risk of, or has led to, an error. Nor does Petitioner claim he is not the person who ICE sought to detain. Additionally, Petitioner was convicted of assault in the second degree—a felony—for which he was sentenced to incarceration. *See* Dkt. 4-2 at 2. This demonstrates that Petitioner poses a risk of danger to the community—and his willful disregard for the law also renders him a flight risk.

---

deportable aliens, the Due Process Clause does not require it to employ the least burdensome means," so it is sufficient if "detention necessarily serves the purpose of preventing deportable aliens from fleeing prior to or during their removal proceedings"). And the *Demore* majority opted for a bright-line rule: the government can detain an alien for as long as deportation proceedings are still "pending." 538 U.S. at 527. Nevertheless, an analysis of the *Mathews* factors does not alter the outcome.

35

Lastly, the Government has a substantial interest in ensuring that deportable aliens appear for immigration proceedings. Indeed, the "public interest is substantial given the high flight rate of those released on bail." *Parra*, 172 F.3d at 958. The Government also has a substantial interest in this and many like cases in preventing risk to the community by releasing potentially dangerous aliens from detention.

In sum, even if some Governmental deprivation—and some relevant and context-specific liberty rights—existed here, the amount of corresponding process that would be due to Petitioner on this release question under the three-factor, "flexible," and "situation[al]" approach outlined in *Mathews* remains the amount provided for by Congress.

## CONCLUSION

For these reasons, the relief requested in the Petition for a writ of habeas corpus is denied. The Petition is dismissed. The Clerk of Court shall close this case.

SO ORDERED.

Dated:      March 19, 2026
            Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

36